NATALIE K. WIGHT, OSB #035576
United States Attorney
District of Oregon
**RYAN W. BOUNDS, OSB #000129**
Assistant United States Attorney
Ryan.Bounds@usdoj.gov
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | 3:24-mj-00010 |
| v. | |
| **SERGEY V. LEBEDENKO,** **GALINA A. LEBEDENKO,** | **GOVERNMENT'S MOTION TO REVOKE DEFENDANTS' RELEASE** |
| **Defendants.** | |

The United States respectfully moves this Court to revoke the orders of release for defendants Sergey Lebedenko ("Sergey") and Galina Lebedenko ("Galina"). Defendants pose an obvious risk of flight, and there are no combination of conditions that would reasonably assure their appearance for future proceedings in this district.

### I.    FACTUAL BACKGROUND

Defendants, a husband and wife who immigrated from Ukraine as adults in the mid-1990s, were arrested today on a Complaint charging them with wire fraud and money laundering in violation of 18 U.S.C. §§ 1343 and 1956. The charges stem from a scheme spanning the years 2016 through 2023, during which defendants stole some **$34 million** from an elderly Portland resident. Defendants defrauded the victim ("V-1") by means of thousands of unauthorized and

**Government's Motion to Revoke Defendants' Release**                                                                                              Page 1

inflated charges to V-1's American Express account ("Amex"), which was paid directly by V-1's financial institution and rarely reviewed by V-1.

As recounted in the Affidavit of FBI Special Agent Jared Rollins, V-1 reported that V-1 started hiring Sergey's chauffeur service, Astra Limousine and Town Car Service, in 2006 or 2007. Sergey's and V-1's relationship expanded over time but remained limited to the provision of personal services that required neither expertise nor special skills. Sergey eventually drove V-1 most days V-1 was in town and did other tasks, including the provision of handyman services, housesitting V-1's Portland-area home while V-1 was away, and running errands for V-1 and V-1's romantic partner. Galina also occasionally ran errands for them.

Sergey originally charged V-1's Amex $90 per hour through defendants' Astra Limousine and Town Car Service, but V-1 and Sergey later negotiated reduced rates in light of the broader range of personal services that Sergey and Galina were providing. On September 30, 2013, Galina emailed V-1 an invoice for services purportedly rendered the preceding week. That invoice billed 45 hours for a total of $3,570. This was one of the few invoices, if not the only one, defendants ever sent to V-1.

In April 2016, Galina registered Astra Car Service, LLC ("Astra") with Oregon's Secretary of State, with Sergey as the company's registered agent. Defendants thereafter debited V-1's Amex through Astra's card processor and merchant account. Although Sergey personally provided most of the services to V-1, Sergey demurred whenever V-1 questioned charges to the Amex, claiming Galina was "the Boss." When V-1 recently learned that defendants had charged $34 million since 2016, V-1 was "utterly astounded."

A review of defendants' and Astra's account records suggests that the overwhelming bulk of defendants' income was generated from charges to V-1's Amex. In November 2021, for

instance, Astra's business checking account received 55 deposits totaling $797,090 from Astra's merchant (credit card) account. Fifty-four of those deposits—comprising all but $100 of that sum—were derived from charges to just one card: V-1's Amex.

Defendants apparently used some of the proceeds of this colossal heist to buy real estate, including multimillion-dollar vacation homes in Sunriver, Oregon, and Bermuda Dunes, California, and houses in the greater Portland metropolitan area for their two adult daughters and their pastor. Defendants also used V-1's money to invest in residential properties for resale. They recently listed two such properties, in Silverton, Oregon, and Vancouver, Washington, for a total price of more than $1.5 million. Many of these real properties were purchased through or transferred to trusts and limited-liability companies set up to launder defendants' loot.

Defendants also acquired a Cessna Citation III private jet for approximately $1.5 million. That jet, which is based in Aurora, Oregon, has flown some 10 to 12 times over the last four months. Its most common itinerary is to the airport in Thermal, California, which is only ninety miles north of the Mexican border on U.S. Highway 111.

The execution of search warrants at defendants' Portland residence and Sunriver house at the time of their arrests also yielded $100,000 in cash, some 150 ounces of gold bullion (worth approximately $300,000), and twelve firearms.

All of the foregoing assets account for a relatively small proportion of the $34 million defendants took. The disposition of at least $20 million in stolen funds remains a mystery. Defendants declined to provide information regarding their finances when interviewed by Pretrial Services.

## II.  PROCEDURAL POSTURE

Defendants made their initial appearance on the Complaint at criminal court, the Honorable Stacie F. Beckerman presiding, this afternoon.  Pretrial Services, noting a lack of criminal history and the government's seizure of their U.S. passports, opined that "[t]here is no information available to suggest the defendant[s] present a risk of nonappearance" and recommended release on their own recognizance.

The government opposed release and argued that defendants should be detained due to the risk of their flight from prosecution.  The government emphasized the unprecedented scale of the theft, the extent to which tens of millions of dollars in stolen funds are unaccounted for and may be readily accessible from (or transportable) abroad, defendants' ongoing connections to Ukraine, and their access to and control of a private jet.   The government also emphasized that defendants' successful prosecution would result not only in Guideline sentencing ranges of at least 108 months but also defendants' loss of their homes and all of their other ill-gotten assets.

Judge Beckerman declined to detain defendants or to stay her release orders to facilitate this Court's review.  Judge Beckerman also declined the government's request in the alternative for location monitoring and home confinement.

Instead, Judge Beckerman ordered both defendants released on the conditions—insofar as they pertained to preventing defendants from absconding with V-1's money—that they not leave the State of Oregon, travel aboard any aircraft, or transfer assets exceeding $10,000 in value without prior approval from pretrial services.  (ECF Nos. 6-7.)

## III.  LEGAL STANDARD

Review of a magistrate judge's release order is *de novo*.  *United States v. Koenig*, 912 F.2d 1190, 1192-93 (9th Cir. 1990).  The Court, however, "is not required to start over in every

case, and proceed as if the magistrate's decision and findings did not exist." *Id*. at 1193.  Rather, the court should "review the evidence before the magistrate and make its own independent determination whether the magistrate's findings are correct, with no deference." *Id*.

The Bail Reform Act provides that defendants shall be detained pending trial where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e).  The government bears the burden of establishing risk of flight by a mere preponderance of the evidence.  *See United States v. Aitken*, 898 F.2d 104, 107 (9th Cir. 1990); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).

18 U.S.C. § 3142(g) sets forth the statutory factors to consider: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a minor victim; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including the person's character, physical and mental condition, family and community ties, employment, financial resources, past criminal conduct, history relating to drug or alcohol abuse, and supervision status at the time of the current offense; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g).

Finally, the Federal Rules of Evidence do not apply in pretrial detention proceedings. Fed. R. Evid. 1101(d)(3); 18 U.S.C. § 3142(f).  Accordingly, both the government and the defense may present evidence by proffer or hearsay.  *Winsor*, 785 F.2d at 756; *see also United States v. Bibbs*, 488 F. Supp. 2d 925, 925-26 (N.D. Cal. 2007).

## IV.   NO CONDITIONS CAN REASONABLY ASSURE DEFENDANTS' APPEARANCE AS REQUIRED.

This Court cannot fashion any combination of conditions that would reasonably assure defendants' appearance at future proceedings.  Defendants' personal circumstances and the nature and gravity of their offenses render defendants too able and too incentivized to flee, and no conditions could effectively mitigate that risk.  In addition, the statutory factors weigh in favor of detention.

### a.  *The Nature and Circumstances of the Offenses*

The government acknowledges that these crimes are not violent and do not carry presumptions of detention. Defendants' crimes are, however, unprecedented in this district in their scale and manifestly abusive in their execution.  Defendants knowingly preyed on the trust of an elderly victim.  After successfully bilking V-1 out of the first couple million dollars, defendants also must have discerned that V-1's finances were not under the active scrutiny of accountants and lawyers equipped or inclined to detect such malfeasance.  V-1 obviously had substantial financial resources but lacked the presence of mind and the support structures in place to prevent defendants' egregious depredations.  Defendants proceeded with this knowledge to steal a truly staggering sum of money.

The extent of their theft and apparently sprawling money-laundering efforts justify weighing this factor against defendants' release.  As the Ninth Circuit has explained:

> Consideration of the nature of the offenses charged involves consideration of the penalties. The defendants are charged with multiple counts, and it is reasonable, from their perspective, to look at the potential maximum sentences they face if they were found guilty on each count and sentenced consecutively on each count.

*United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990). In this case, defendants face charges of wire fraud and money laundering. Both counts carry 20-year maximum sentences. 18 U.S.C. §§ 1343 (wire fraud), 1956(a)(1) (money laundering). Under *Townsend*, this Court must consider that defendants are facing maximum sentences of up to 40 years' imprisonment—before accounting for the hundreds of individual wire fraud counts (each carrying a 20-year maximum sentence) for which they could be readily indicted. Defendants' maximum sentences exceed those the defendants faced in *Townsend*, where the Court held this factor weighed against defendants' release.

Even if this Court were to consider only the sentencing exposure that is readily foreseeable, defendants face adjusted offense levels of thirty-five points under the U.S. Sentencing Guidelines. *See* USSG § 2B1.1(a)(1) (7-level base offense for wire fraud), (b)(1)(L) (22-level enhancement for theft of more than $25MM), and (b)(10)(C) (2-level enhancement for sophisticated means); § 2S1.1(b)(2)(B) (2-level enhancement for § 1956 money laundering), (b)(3) (2-level enhancement for sophisticated money laundering); § 3A1.1(b)(2) (2-level enhancement for vulnerable victim); § 4C1.1 (2-level reduction for lack of criminal history). That offense level yields of low-end Guideline sentence of 168 months—or 14 years' imprisonment. *See* USSG Ch. V pt. A.

Setting aside their anticipated prison sentences, defendants' persistence over nearly eight years and the sophistication of their money-laundering operation militates for weighing the nature and circumstances of the charged offenses against their release. *Cf. Townsend*, 897 F.2d at 994 (emphasizing defendants' "sophisticated criminal conduct" and "convoluted transactions" as well as "the persistence with which these transactions were pursued" in denying release).

b. *The Weight of the Evidence*

In the Ninth Circuit, this is the least important factor, but it weighs heavily against defendants' release here. Defendants perpetrated the fraud in person and through Astra, their own company. Records subpoenaed from OnPoint Community Credit Union document the movement of the proceeds through defendants' accounts. Defendants personally created and registered with the State of Oregon the trusts and companies that were used to elicit and launder the proceeds of their scam. Eye-watering amounts of cash and gold were recovered from defendants' residences at the time of their arrest.

There is no doubt defendants took the money in this case. Nor is there any plausible innocent explanation for two unskilled workers' having billed a single elderly victim $34,000,000 for driving him around and running personal errands.

This factor weighs heavily against defendants' release.

c. *The History and Characteristics of the Defendants*

This factor also weighs in favor of defendants' detention. Although they have no known criminal history or drug problems, their ties to the community are largely transferrable: defendants can simply flee with their family members and their ill-gotten riches on their private jet. Such ties are also offset by defendants' having lived half their lives in Ukraine before immigrating to the United States. Should defendants flee to Ukraine, there is almost no prospect of securing their extradition unless they abjured their native citizenship. Ukraine is constitutionally precluded from surrendering its own citizens.

Defendants asserted at their detention hearing that they had built and run a thriving business since arriving in the 1990s, but their business is just a mirage. For the last several years, defendants appear to have had only one customer who mattered: V-1. The notion that

**Government's Motion to Revoke Defendants' Release** **Page 8**

defendants' business will keep them tied to the jurisdiction defies credulity; Astra could never generate the profits defendants would risk by staying.

       *d.  No Conditions Will Reasonably Assure Defendants' Appearance*

The conditions of release imposed by the Magistrate Judge will not reasonably assure defendant's appearance—nor could any realistic set of restrictions do so in these unprecedented circumstances.  The manifest risk in this case is that defendants will take their unaccounted-for riches and fly off in their private jet to a jurisdiction—including their native country—that will not extradite them to the United States.  Defendants have every incentive and more than ample means to do just that.

As the Ninth Circuit has acknowledged in such circumstances, no restriction short of detention could reliably prevent flight.  *See Townsend*, 897 F.2d at 995 ("Nor does the wearing of an electronic device offer assurance against flight occurring before measures can be taken to prevent a detected departure from the jurisdiction.").  The existing release orders, which do little more than direct defendants not to flee or to take obvious steps toward fleeing, offer no security at all.

## V.  CONCLUSION

Given the manifest risk that defendants will flee prosecution, the government respectfully moves this Court to order they be detained.

Dated: January 23, 2024.　　　　　　　　　　　　Respectfully submitted,

                                                NATALIE K. WIGHT
                                                United States Attorney

                                                */s/ Ryan W. Bounds*
                                                RYAN W. BOUNDS, OSB #000129
                                                Assistant United States Attorney